# NO. 12-19-00346-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JASON HARVEY LEE,* *APPELLANT* | § | *APPEAL FROM THE 420TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jason Harvey Lee appeals his conviction for murder. In three issues, Appellant argues that the evidence is insufficient to support the trial court's judgment, certain witness's testimonies are not sufficiently corroborated, and the trial court abused its discretion in failing to submit a charge instruction related to corroboration. We affirm.

## BACKGROUND

Appellant was charged by indictment with the murder of Thomas Sluterbeck and pleaded "not guilty." The indictment further alleged that Appellant previously had been convicted of two felonies. The matter proceeded to a jury trial. At the trial's conclusion, the jury found Appellant "guilty" as charged. Following a trial on punishment, the jury assessed Appellant's punishment at imprisonment for life. The trial court sentenced Appellant accordingly, and this appeal followed.

## EVIDENTIARY SUFFICIENCY

In his first issue, Appellant argues that the evidence is legally insufficient to support the trial court's judgment. In his second issue, he contends that the testimonies of two witnesses—an accomplice and a jailhouse informant—are not sufficiently corroborated.

**Standard of Review**

The ***Jackson v. Virginia***[1] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See **Brooks v. State***, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See **Jackson***, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also **Escobedo v. State***, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See **Jackson***, 443 U.S. at 320, 99 S. Ct. at 2789; *see also **Johnson v. State***, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See **Jackson***, 443 U.S. at 320, 99 S. Ct. at 2789; ***Johnson***, 871 S.W.2d at 186. A jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See **Lee v. State***, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See **Tibbs v. Florida***, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. ***Rodriguez v. State***, 521 S.W.3d 822, 827 (Tex. App.–Houston [1st Dist.] 2017, no pet.) (citing ***Sorrells v. State***, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the guilt of the appellant, provided that the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See **Hooper v. State***, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences so long as each inference is supported by the evidence presented at trial. ***Id.*** at 15. Juries are not permitted to reach conclusions based on mere speculation or factually unsupported inferences or presumptions. ***Id.*** An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. ***Id.*** at 16.

---

[1] 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

## Discussion

To meet its burden of proof that Appellant committed the charged offense, the State was required to prove that he intentionally or knowingly caused Sluterbeck's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019).

### *Accomplice Testimony*

At trial, Cassidy Fuqua testified that on January 8, 2018, she was with Sluterbeck[2] at his house, where a friend picked her up and drove her to her mother, Cathy Lewis's, house near Nacogdoches, Texas. Fuqua stated that Sluterbeck arrived in his truck at Lewis's house later that day and that Appellant arrived shortly thereafter. She further stated that while it still was daylight, she, Appellant, and Sluterbeck left her mother's house in Appellant's car and drove to a cemetery. According to Fuqua, they arrived at the cemetery at "twilight." She remained in Appellant's vehicle while Appellant and Sluterbeck walked into the graveyard to a location where she no longer could see them. Soon thereafter, Fuqua heard multiple gunshots, and Appellant returned to the vehicle without Sluterbeck. Fuqua testified that Appellant drove away from the cemetery but soon turned the vehicle around and returned to the cemetery parking lot. At that point, Fuqua observed a white male standing in the tree line before Appellant again drove away from the cemetery to an apartment complex, where they stopped briefly before he drove them to a gas station in Mount Enterprise, Texas. Appellant gave Fuqua money to go inside the gas station and get a drink. Thereafter, they drove to Appellant's residence, where they remained for most of the following day.[3] Fuqua testified that Appellant then drove them back to Nacogdoches and, later, to Lewis's residence so Fuqua could retrieve more clothes. She further

---

[2] The record reflects that Appellant and Sluterbeck are half-brothers.

[3] Fuqua stated that at some point while they were in the car together, Appellant showed her a pistol and made her put her hand on it.

testified that while they were there, law enforcement officers arrived at the residence and she was taken to the Nacogdoches County Sheriff's Department for questioning.

William King, an inmate in the Nacogdoches County Jail, testified that on September 18 and 19, 2019, he was a watch trustee in the cell block where Appellant was confined. On September 19, Appellant spoke to King about some of the underlying facts of this case. According to King, Appellant told him that it did not matter that he did not have an alibi since Sluterbeck deserved to die because he made a drug deal with members of a criminal street gang affiliated with the "Bloods" called "Piru," to which Appellant belongs. King stated that Appellant explained that Sluterbeck had been "fronted dope" but did not pay Piru back and Appellant had been the "go-between" on the drug deal; when Sluterbeck did not repay his debt, Appellant had to resolve the matter by killing him for Piru. King further stated that Appellant recounted the events leading up to the murder. According to King, Appellant told him that he, Sluterbeck, and a girl went to a graveyard to visit his and Sluterbeck's mother's grave. Appellant and Sluterbeck got out of the car while the girl stayed behind. The two men walked to their mother's grave, where they began to argue. They next walked to a nearby tree, and Appellant shot Sluterbeck five times under the tree. Appellant told him he shot Sluterbeck five times as homage to the five-pointed star, a symbol of Piru. King testified that later that evening, Appellant argued with another inmate in the cell block, yelling that Piru meant more to him than his own family, that he killed his brother for Piru and, as a result, he would not have a problem killing that inmate.

*Nonaccomplice Evidence*

Lewis testified that on the day of murder, Fuqua was at her house with Sluterbeck. She further testified that Appellant arrived at her house when it still was daylight. Lewis stated that when she and Fuqua began to argue, Appellant took Fuqua outside and Sluterbeck followed. Lewis observed Appellant, Fuqua, and Sluterbeck congregating by Appellant's vehicle before she went back inside her house. According to her testimony, when she reemerged from the house approximately thirty minutes later, the three no longer were there and Appellant's vehicle was gone. Lewis testified that the next day, Fuqua and Appellant returned to her house in Appellant's car without Sluterbeck. She observed that Fuqua appeared scared and was silent when Lewis asked her of Sluterbeck's whereabouts. Lewis stated that when law enforcement

4

arrived at her house, Appellant attempted to eavesdrop while they still were outside, was pacing, and appeared as if he might attempt to flee.

Wesley Moorehead, who lives next to Gravel Ridge Cemetery near Nacogdoches, testified that on the evening of January 8, 2018, at approximately 5:45 p.m., he heard three or four gunshots fired in rapid succession coming from the direction of the cemetery. According to Moorehead, due to the rapid rate of the gunfire, he was concerned and went to investigate the location in the cemetery where he believed the shots originated. Moorehead stated that it was dusk, but there still was ambient light and it took him less than two minutes to reach the cemetery property line. Once there, he observed a vehicle being driven away from the cemetery grounds at a high rate of speed but lost sight of the vehicle as it crested a hill. About two minutes later, the same vehicle[4] returned to the cemetery at a high rate of speed. Moorehead testified that he was concerned for his safety and attempted to secrete himself in a nearby tree line. From there, he observed that the car came to a stop in the cemetery parking lot, at which point the male driver quickly exited the car and twice exclaimed, "What happened!" before he reentered the vehicle and again sped away, heading eastbound on Farm to Market Road 225 toward Nacogdoches. Afterward, Moorehead continued to investigate, eventually discovered Sluterbeck's body, and called 9-1-1 at approximately 6:00 p.m. Moorehead stated that the elapsed time from when he first heard the gunshots to when he called police was between twelve and fifteen minutes and that law enforcement officers arrived at the scene seven minutes after he called.

Nacogdoches County Sheriff's Department Lieutenant Investigator Clayton McQueen testified that he investigated the scene on the night in question, which consisted of his processing evidence and taking photographs and measurements. He further testified that he observed tire tracks from a single vehicle but with different tread patterns, as well as footprints and spent shell casings near the victim's body. McQueen explained that the ground was damp from rainfall the preceding day, which made freshly made shoe prints and tire tracks stand out to him. McQueen stated that he returned to the scene the next morning with Texas Ranger Jim Hicks to take more

---

[4] Moorehead explained that visitors and burials at the cemetery are infrequent—approximately one burial per year and one visitor per month. As a result, he did not believe the car he observed speeding into the cemetery was someone else who decided to investigate the gunshots. Thus, he concluded that the person he saw must be the same person who fired the shots.

photos.[5]  He further stated that the Texas Department of Public Safety (DPS) later notified him that it had identified the victim as Sluterbeck and that he eventually learned that Fuqua recently had resided with Sluterbeck.  He also learned that Sluterbeck's mother was deceased and was buried at Gravel Ridge Cemetery.  He testified that other officers went to the Lewis property and located several vehicles, including one which belonged to Sluterbeck and a dark colored vehicle, which belonged to Appellant and which matched the description of the vehicle Moorehead told officers he saw on the night in question.  According to McQueen, officers determined that Appellant's vehicle had several different tires with different tread patterns.  McQueen stated that he spoke to Cathy and Edward Lewis, who confirmed that on the day in question, Sluterbeck, Fuqua, and Appellant were together around 5:00 p.m.  He further stated that officers executed a search warrant at Appellant's home and recovered a pair of red Nike tennis shoes, which were consistent with the size and tread pattern of the shoe print impressions observed and photographed at the crime scene near Sluterbeck's body.  McQueen testified that the shell casings recovered from the crime scene were .40 caliber.  He also testified that video surveillance footage was recovered, in which Appellant can be seen on the evening in question wearing the red Nike shoes with white soles officers later recovered from his house.  McQueen stated that, in another video, he observed Appellant's car at 6:05 p.m. traveling eastbound on Seale Street in Nacogdoches and explained that the most direct route from Gravel Ridge Cemetery to the Lucky Stop gas station[6] is approximately five miles and can be driven in about ten minutes.

DPS Forensic Scientist Jenny Lousbury, who specializes in "trace" evidence, testified that she analyzed the images of the shoe prints and vehicle tire tread marks from the crime scene and compared them to physical impressions she created from the shoes seized from Appellant's residence and the tread pattern from the tires on his vehicle.  Lousbury stated that the tread pattern on Appellant's shoes is consistent with the shoe prints recovered from the crime scene near the victim's body.  She further stated that the tires on Appellant's vehicle had four tires with three different tread patterns, the tire tread impressions from the crime scene were made from one vehicle with four tires, three of which had different tread patterns, and the three different

---

[5] Other testimony establishes that the area was covered with tarps to preserve the imprints and the scene was guarded by a law enforcement officer that night.

[6] This gas station is among the sources of surveillance footage on which Appellant appears.

tread patterns from the tires on Appellant's vehicle were consistent with the tread patterns found at the crime scene. She posited that it would be "uncommon" for a car to have three different tread patterns, which matched the three different tread patterns left at the crime scene.

Forensic Pathologist John Ralston testified that he reviewed the autopsy notes and photographs and agreed with the findings that Sluterbeck suffered four or five gunshot wounds, which caused his death. Shane Windsor, a DPS analyst for firearms and tool marks, testified that the shell casings recovered from the crime scene all were fired from the same weapon. He stated that the projectiles were most consistent with having been that of a .40 caliber round and the shell casings also were .40 caliber. Johnny Young testified that he owns a hardware store in Mount Enterprise, Texas. Young stated that Appellant, who he has known for years, came to his store the Thursday before the murder and asked to purchase .40 caliber ammunition, which Young did not have available for sale at that time.

Nacogdoches County Sheriff's Department Jailer Stephen Jernigan testified that on September 19, 2018, he witnessed Appellant and King speaking during the early morning hours and overheard Appellant tell King that he was "tired of seeing the pictures . . .[,] that he was there when it happened, and he was tired of reliving it." Nacogdoches Police Department Detective Adam Sparks testified about his experience with gang offender identification. He discussed the Blood gang, its criminal activities, groups, and cliques of Blood members like "Piru." According to Sparks, based on his knowledge and observations,[7] he concluded that Appellant is a member of 59-Piru, a Nacogdoches subset of the Blood gang.

*Corroboration of Accomplice's and Jailhouse Informant's Testimonies*

Appellant argues that Fuqua's testimony was not corroborated sufficiently to satisfy the "accomplice-witness rule" found in Texas Code of Criminal Procedure, Article 38.14. He further argues that King's testimony was not corroborated sufficiently to satisfy Texas Code of Criminal Procedure, Article 38.075.[8] Article 38.14 states, "A conviction cannot be had upon the

---

[7] Sparks described Appellant's myriad tattoos—a five-pointed star, a five-pointed crown, a dog's paw, the word "Piru," the acronym "MOB," which stands for "Member of Blood," the "west side" hand signal, which signifies Blood territory in Nacogdoches, a red dog paw with the color red's being associated with Bloods, and the words "Made Man"—which he stated are gang related.

[8] Article 38.075 states, in pertinent part,

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or

testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). "An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004)); *Turner v. State*, 571 S.W.3d 283, 287 n.6 (Tex. App.–Texarkana 2019, pet. ref'd). It is undisputed that Fuqua is an accomplice as a matter of law. *See Paredes*, 129 S.W.3d at 536 ("An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser included offense").

When evaluating the sufficiency of corroborating evidence under Article 38.14, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The tends-to-connect standard does not present a high threshold because the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.*; *see Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.–Austin 2002, no pet.). Rather, the evidence simply must link the accused in some way to the commission of the crime. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

Such evidence "is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)). The Texas Court of Criminal Appeals has expounded on the concept as follows:

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the

confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075(a) (West Supp. 2020). The standard required for corroboration of a jailhouse informant's testimony under Article 38.075 is the same as is required for corroboration of an accomplice witness's testimony under Article 38.14. *See Watkins v. State*, 333 S.W.3d 771, 778 (Tex. App.–Waco 2010, pet. ref'd).

offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted). In determining whether the nonaccomplice evidence tends to connect the defendant to the commission of the offense, "we view the evidence in the light most favorable to the jury's verdict." *Brown*, 270 S.W.3d at 567.

Viewed in the light most favorable to the jury's verdict, the nonaccomplice evidence in this case established that (1) Appellant, Sluterbeck, and Fuqua were seen together at Lewis's residence late in the afternoon on the day of the murder in Appellant's car and left her property within thirty minutes of that time, (2) at approximately 5:45 p.m., Moorehead heard three to four gunshots fired in rapid succession coming from Gravel Ridge Cemetery, (3) Moorehead observed a car leave but quickly return to the cemetery, where the driver, a male, briefly exited the vehicle before speeding away, (4) after discovering Sluterbeck's body, Moorehead called police at 6:00 p.m., (5) fresh tire tracks at the scene were made by a car with three different tires each with distinct tread patterns, (6) fresh shoe prints and .40 caliber shell casings were found near the victim, (7) Appellant and Sluterbeck were half-brothers, and their deceased mother is buried at Gravel Ridge Cemetery near to where Sluterbeck's body was found, (8) soon after Moorehead saw the vehicle leave the cemetery the second time, Appellant appeared in surveillance footage at the Lucky Stop Gas Station wearing red Nike shoes with white soles, (9) officers seized Appellant's car, which had three different tires with distinct tread patterns, which were consistent with the impressions left at the scene, (10) officers also seized red Nike shoes, the size and tread pattern of which were consistent with the shoe prints left at the scene near the victim's body, (11) Appellant attempted to buy .40 caliber ammunition in the days before the murder, (12) Appellant is known to be a member of the Blood gang subset known as "Piru," (13) Appellant and Fuqua returned to Lewis's residence the next day, and Sluterbeck no longer was with them, (14) when officers came to Lewis's property, she described Appellant as acting nervous, as if he might flee, and (15) Appellant was overheard by a jailer telling another inmate that he was present when Sluterbeck was murdered.

We reiterate that the "tends-to-connect" standard does not present a high threshold. *See Solomon*, 49 S.W.3d at 361. Here, although there is no eyewitness testimony to Sluterbeck's murder, Appellant and Sluterbeck were seen together within an hour of the murder, and the forensic evidence, i.e., a consistent set of tire tread impressions at the cemetery and shoe prints found near the body, linking Appellant to the murder scene is strong. Furthermore, the jury could consider Moorehead's testimony that he saw a male hastily leaving the scene in a passenger car similar to Appellant's within minutes of his having heard multiple gunshots fired in rapid succession, the timing of Appellant's appearance in the Lucky Stop Gas Station surveillance footage, Appellant's having sought to purchase .40 caliber ammunition just days before the murder, Appellant's and Sluterbeck's connection to the cemetery vis-à-vis their mother's final resting place, and Jernigan's testimony about Appellant's statement that "he was there when it happened." Thus, we conclude, based on the totality of the nonaccomplice testimony, that a rational juror could find that such evidence tends to connect Appellant to the offense. *See Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (combined cumulative weight of the incriminating evidence furnished by nonaccomplice witnesses which tends to connect the accused with commission of offense satisfies test).

Furthermore, based on our review of the record, including the evidence recounted above, we conclude that there was ample evidence to permit the jury to find beyond a reasonable doubt that Appellant intentionally or knowingly caused Sluterbeck's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Therefore, we hold that the evidence is legally sufficient to support the trial court's judgment. Appellant's first and second issues are overruled.

### ACCOMPLICE-WITNESS INSTRUCTION

In his third issue, Appellant argues that the trial court abused its discretion by not including in its charge an instruction that the accomplice-witness's testimony and jailhouse informant's testimony could not be used to corroborate one another.

The trial judge has an absolute sua sponte duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged. *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008). Because the corroboration of accomplice-witness testimony is required before a conviction can stand, the jury must be instructed accordingly, but the particularities of the instruction that must be given depends on the circumstances of each case.

10

*See Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013). For instance, when there is more than one accomplice witness, an instruction that "one or more accomplices cannot corroborate each other; but such corroborative evidence, if any, must be from some other source than said accomplices" is appropriate. *See, e.g.*, *Munoz v. State*, 853 S.W.2d 558, 560 n.4 (Tex. Crim. App. 1993).

Here, because the standard required for corroboration of a jailhouse informant's testimony under Article 38.075 is the same as is required for corroboration of an accomplice-witness's testimony under Article 38.14, we conclude that the trial court had a sua sponte duty to instruct the jury on the law applicable to the case. Therefore, the trial court should have included an instruction in its charge that the jury could not rely on Fuqua's testimony to corroborate King's testimony or on King's testimony to corroborate Fuqua's. *See Oursbourn*, 259 S.W.3d at 179; *Munoz*, 853 S.W.2d at 560 n.4; *Watkins*, 333 S.W.3d at 778.

## Harm Analysis

All alleged jury charge error must be considered on appellate review regardless of preservation in the trial court. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Once a court of appeals determines that error occurred, it must analyze that error for harm. *Id.* The issue of error preservation is not relevant until harm is assessed because the degree of harm required for reversal depends on whether the error was preserved. *Id.* When, as here, the defendant fails to object to the charge, we will not reverse unless the record shows "egregious harm" to the defendant. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

To determine "egregious harm," a reviewing court examines "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *see also Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). The appellant must have suffered actual, rather than theoretical, harm. *Warner*, 245 S.W.3d at 461. Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Id.* at 461–62.

### *Jury Charge*

We first consider the entirety of the court's charge. *See Warner*, 245 S.W.3d at 461. We note that the charge correctly instructs the jury that both Fuqua's and King's testimonies must be

corroborated, but as Appellant contends, it fails to instruct the jury that Fuqua's testimony cannot be used to corroborate King's testimony and vice versa. *See Oursbourn*, 259 S.W.3d at 179; *Munoz*, 853 S.W.2d at 560 n.4; *Watkins*, 333 S.W.3d at 778. Therefore, we conclude that this factor weighs in favor of our finding egregious harm. *See Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015).

### *State of the Evidence*

We next consider the state of the evidence, including the contested issues and weight of the probative evidence. Under this prong, we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused the appellant actual harm. *See id.*

As it relates to Appellant's connection to the crime, from Fuqua's testimony, the jury learned that (1) she, Appellant, and Sluterbeck were together at Lewis's house on the day in question, (2) they drove to a cemetery and arrived as night fell, (3) Appellant and Sluterbeck exited the vehicle and walked into the graveyard while Fuqua remained in the vehicle, (4) Fuqua heard multiple gunshots, (5) Appellant returned to the vehicle without Sluterbeck, and (6) Appellant and Fuqua drove out of the cemetery but returned briefly before driving away again. Based on our review of the entirety of the record, we note that the jury reasonably could surmise Appellant's, Sluterbeck's, and Fuqua's whereabouts on the afternoon in question as well as their approximate departure time from Lewis's property based on Lewis's testimony. Furthermore, the jury reasonably could determine that Appellant was present at the cemetery and in the graveyard based on evidence relating to Appellant's footprints found near Sluterbeck's body and the distinct set of tire tread patterns located at the cemetery, which matched the tire tread patterns on Appellant's vehicle. Lastly, the jury reasonably could conclude from Moorehead's testimony that multiple gunshots were fired on the cemetery grounds near twilight and that a male driving a car sped away from the cemetery, returned to the cemetery briefly, then sped away again.

As it relates to Appellant's connection to the crime, from King's testimony, the jury learned that (1) Appellant believed Sluterbeck deserved to die because he made a drug deal with members of the Bloods gang subset, Piru, of which Appellant is a member, (2) Sluterbeck was killed for his failure to pay back a drug debt he owed to Piru, (3) Appellant told King that he, Sluterbeck, and a girl went to a graveyard to visit his and Sluterbeck's mother's grave,

12

(4) Appellant told King that he and Sluterbeck got out of the car while the girl stayed behind, (5) Appellant shot Sluterbeck multiple times near their mother's grave, and (6) while he argued with other inmates, Appellant yelled that he killed his brother for Piru. King's testimony supplies facts not mentioned elsewhere in the record such as a motive behind Sluterbeck's murder and Appellant's explicit confession to the murder. Appellant's knowledge of the reason Sluterbeck was killed does little to connect Appellant to the murder apart from the fact that Appellant's confession to King was part and parcel to that explanation. Without Appellant's concurrent confession, the motive for the crime would lie with Piru and its membership as a group since Sluterbeck allegedly owed Piru a drug debt. Even still, we note that Jernigan testified that he witnessed Appellant and King speaking and overheard Appellant tell King that he was "tired of seeing the pictures . . .[,] that he was there when it happened, and he was tired of reliving it."

We have reviewed the entirety of the record and have considered it in light of the charge error at issue. *See id.* Having done so, we conclude that nearly all of the facts tending to connect Appellant to Sluterbeck's murder that are established by Fuqua's and King's respective testimonies also are established by other evidence of record on which the jury could have relied to corroborate Fuqua's and King's testimonies. Undoubtedly, Jernigan's testimony about the statements he overheard Appellant make to King, which connect him to Sluterbeck's murder, are not as explicit as Appellant's statements that King recounted in his testimony. Furthermore, there is no way we can be certain that the jury, absent an instruction, relied only on appropriate sources of evidence to corroborate Fuqua's and King's testimonies. Nonetheless, the remaining corroborative evidence on which the jury was entitled to rely and which we have recounted in detail in our discussion of Appellant's second issue, is so strong that we cannot conclude that the trial court's failure to instruct caused Appellant actual harm. *Cf. **Casanova v. State***, 383 S.W.3d 530, 539 (Tex. Crim. App. 2012) (as strength of corroborating evidence increases, reviewing court no longer may be able to declare that lack of accomplice witness instruction resulted in egregious harm). Therefore, we conclude that this factor weighs against our finding egregious harm.

### *Parties' Arguments*

We next consider the parties' arguments and whether any statements made by the State, Appellant, or the trial court during the trial exacerbated or ameliorated the error in the charge.

*See Arrington*, 454 S.W.3d at 844; *see also Ngo*, 174 S.W.3d at 750 (holding that the appellant suffered egregious harm when jury charge did not contain unanimity instruction and jury *repeatedly* was told it need not return unanimous verdict). Here, based on our review of the record, neither Appellant nor the trial court made any statement before the jury that Fuqua's testimony could be relied upon to corroborate King's testimony or that King's testimony could be relied upon to corroborate Fuqua's testimony. During its closing argument, the State made a general statement that King's testimony about Appellant's statements could be used to corroborate Fuqua's testimony. However, the State did not make reference to any of King's specific testimony in this context, nor did it otherwise belabor the point. Furthermore, it made the reference to King's testimony along with references to a host of other testimonies that it argued could be used to corroborate Fuqua's testimony. Therefore, we conclude that this factor weighs only slightly in favor of our finding that the charge error at issue caused egregious harm.[9]

### *Conclusion*

In balancing the aforementioned factors, it is apparent that the jury was presented with an abundance of evidence apart from Fuqua's and King's respective testimonies, upon which it could rely to corroborate those testimonies and which largely was duplicitous of the substance of those testimonies. This corroborating evidence includes (1) Appellant's shoe prints found near the body, (2) tire impressions consistent with the varying tread patterns on Appellant's vehicle, (3) Appellant's relationship to the victim, (4) the location of Sluterbeck's body in relation to his and Appellant's mother's grave, (5) the temporal proximity of when Appellant and Sluterbeck last were seen together at Lewis's house to the murder, (6) the surveillance footage depicting Appellant minutes after the murder entering a gas station wearing the red Nike shoes seized from his residence, the tread pattern of which matched the shoe print impressions left at the crime scene, and (7) the .40 caliber shell casings located next to the victim's body coupled with the fact that Appellant attempted to buy .40 caliber ammunition just days before the murder. This appropriately considered corroborating evidence is so powerful and plentiful that we cannot conclude, even given the absence of a charge instruction and the State's errant but not belabored argument contradicting the law, that the charge error caused Appellant any actual harm that affected the very basis of the case, deprived him of any valuable right, or affected any defensive

---

[9] The parties have not argued, nor has our review of the record found any other relevant information that would be helpful to our determination of whether Appellant suffered egregious harm.

theory.  *See **Warner***, 245 S.W.3d at 461–62.  Therefore, we hold that Appellant did not suffer egregious harm.  Appellant's third issue is overruled.

## DISPOSITION

Having overruled Appellant's first, second, and third issues, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered January 29, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

15



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 29, 2021**

**NO. 12-19-00346-CR**

**JASON HARVEY LEE,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 420th District Court

of Nacogdoches County, Texas (Tr.Ct.No. F1823446)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*